UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.K., individually, and on behalf of E.K., a minor child
with a disability,

                                Plaintiffs,

             -against-

The Board of Education of the City School District of the
City of New York, the New York City Department of
Education, the City of New York, and Chancellor Melissa
Aviles-Ramos, in her official capacity,

                              Defendants.

25-CV-4986

ECF CASE

**COMPLAINT**

## PRELIMINARY STATEMENT

1.      M.K., individually and on behalf of her granddaughter E.K. ("Plaintiffs"), bring

this emergency action for a temporary restraining order ("TRO") and preliminary injunction

("PI") pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§

1400 et seq. ("IDEA"), because Defendants have failed to secure E.K.'s placement in a twelve-

month residential nonpublic school ("NPS") that will accept her without participation in

screening interviews or voluntary consent to enrollment.

2.      E.K. has been diagnosed with Unspecified Trauma- and Stressor-Related

Disorder, Conduct Disorder, Unspecified Cannabis-Related Disorder, Attention-

Deficit/Hyperactivity Disorder ("ADHD"), Unspecified Depressive Disorder, and Eating

Disorder, unspecified. She exhibits dangerous self-injurious behaviors, including scratching,

cutting, induced vomiting, substance abuse, and persistent school refusal.

3.      E.K. displays aggression toward peers, teachers, her grandmother M.K., and her

84-year-old great-grandmother who resides with them. M.K. reports inability to control E.K.,

who routinely violates curfews, refuses school attendance, and roams New York City streets late into the night.

4.    Due to her severe emotional disabilities—particularly school refusal—E.K. has been out of school since November 2024 and is experiencing ongoing irreparable academic and social-emotional harm.

5.    E.K. is eligible for special education services under the IDEA and New York State education laws. Due to E.K.'s persistent school refusal, M.K. has sought residential placement since June 2024. Defendants did not agree to commence the residential placement search process until December 2024.

6.    E.K. has consistently refused to attend screening interviews required by NYSED-approved schools prior to placement consideration, complicating the search process.

7.    Plaintiffs' counsel identified an acceptable residential facility—Moonridge Academy in Cedar City, Utah—an all-girls therapeutic residential NPS that would accept E.K. without screening interviews, implement her IEP, and prevent elopement.

8.    Despite M.K.'s and counsel's efforts to obtain Defendants' agreement to Moonridge placement, these attempts have failed.

9.    Plaintiffs seek emergency relief directing Defendants to: (a) immediately place E.K. at Moonridge Academy; (b) fund residential placement costs on a prospective monthly basis; and (c) fund transportation costs, all pending final administrative and judicial review or until alternative suitable residential placement, whichever occurs first.

10.    Without interim funding, M.K. cannot afford unilateral placement and subsequent reimbursement litigation, leaving E.K. to suffer indefinite irreparable harm.

11.    Defendants have a legal obligation to implement E.K.'s IEP within thirty days of December 18, 2024; this deadline has expired. See 8 N.Y.C.R.R. § 200.4(e)(1).

12.    Plaintiffs assert three legal bases for relief: (1) E.K.'s pendency rights under 20 U.S.C. § 1415(j); (2) this Court's equitable authority under 20 U.S.C. § 1415(i)(2)(C)(iii); and (3) traditional TRO/PI standards.

13.    Plaintiffs are likely to succeed on the merits, and absent immediate judicial intervention, E.K. will continue suffering irreparable educational and treatment denial. Moonridge is the only available residential NPS that has accepted E.K. and is prepared for immediate enrollment.

14.    Following unsuccessful efforts to secure residential placement through administrative processes, Impartial Hearing Officer Carina Patritti, Esq., issued Findings of Fact and Decision ("FOFD") on May 28, 2025, denying Plaintiffs' request for Moonridge placement at public expense. Defendants have not secured any alternative residential NPS placement.

15.    While E.K.'s disabilities impede her cooperation in NPS screening processes, Defendants remain obligated to implement her last agreed-upon IEP recommending twelve-month residential placement.

16.    Defendants have not identified any residential NPS willing to accept E.K. without voluntary interviews or consent—requirements she cannot satisfy due to the very conditions necessitating residential treatment. Plaintiffs seek immediate relief while maintaining full cooperation with Defendants and administrative review processes.

17.    Plaintiffs seek TRO and PI compelling Defendants to fund Moonridge as E.K.'s "pendency" placement under 20 U.S.C. § 1415(j), 34 C.F.R. § 300.518(a), N.Y. Educ. Law §

4404(4), and 8 N.Y.C.R.R. § 200.5(m). Alternatively, this Court may order interim funding pursuant to its equitable authority under 20 U.S.C. § 1415(i)(2)(C)(iii).

18.    Despite partial exhaustion of administrative remedies, IHO Patritti found Defendants denied E.K. FAPE for the 2023-2024 and 2024-2025 school years but determined she lacked authority to order non-approved residential NPS placement absent party agreement regarding NYSED-approved NPS unavailability.

19.    The Office of State Review currently experiences significant appeal backlogs causing substantial decision delays, providing additional grounds for this Court's immediate jurisdiction and temporary relief.

20.    Although the IHO directed Defendants' CBST to reconvene within five business days to pursue residential programs, Defendants have not identified any residential NPS willing to admit E.K. without voluntary screening interviews and consent.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over Plaintiffs' federal claims under the IDEA pursuant to 20 U.S.C. § 1415, 42 U.S.C. § 1988, and as an action raising a federal question under 28 U.S.C. § 1331. This Court may exercise supplemental jurisdiction over Plaintiff's state law claims.

22.    Venue lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) as it is the judicial district in which Defendants are situated and/or reside.

23.    Although Plaintiffs began to exhaust administrative remedies under IDEA, Plaintiffs are not required to complete the administrative review process because this action alleges a violation of the IDEA's *stay put* provision and implementation of the last agreed upon IEP. *See L.G. v. New York City Dep't of Educ.*, No. 23-CV-9268 (JPO), 2023 U.S. Dist. LEXIS

197685, 2023 WL 8044937, at *3-5 (S.D.N.Y. Nov. 3, 2023) *citing Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 531 (2d Cir. 2020); *see also Michaels ex rel. Michaels v. Mills*, No. 02-CV-555, 2004 U.S. Dist. LEXIS 6155, at *3 (W.D.N.Y. Feb. 14, 2004) (exhaustion is not required when an agency has failed to provide services specified in a student's IEP).

24.    An expedited judicial review of E.K.'s current educational placement is also necessary because of the increasing influx of State Review Officer ("SRO") appeals and the current backlog in the Office of State Review.

25.    If successful, Plaintiffs should be entitled to costs and reasonable attorneys' fees under 42 U.S.C. § 1988(b), 20 U.S.C. § 1415(i)(3), and 29 U.S.C. § 794(a)(2).

## PARTIES

26.    M.K. is the paternal grandmother and the legal guardian of E.K., a student with an eligible disability within the meaning of the IDEA, Section 504, and the ADA. E.K.. was, and continues to be, a child with an emotional disability, as defined by the IDEA and New York State Regulations. *See* 20 U.S.C. § 1401(3); 34 C.F.R. § 300.8(c)(1)(i); 8 N.Y.C.R.R. § 200.1(zz)(1).

27.    Plaintiffs reside together in the State of New York, City of New York, County of Queens, located within Defendants' school district.

28.    Initials are used to identify Plaintiffs in the pleadings and briefs in this action to preserve the confidentiality of Plaintiffs in conformity with the privacy provisions of the IDEA, 20 U.S.C. §1417(c), and the Family Educational and Privacy Rights Act ("FERPA"), 20 U.S.C. § 1232g, and pursuant to the Federal Rules of Civil Procedure 5.2(a)(3).

29.     Defendant THE BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK ("BOE") is the official body charged with the
responsibility of developing policies with respect to the administration and operation of the
public schools in the City of New York.

30.     Upon information and belief, Defendant the NEW YORK CITY DEPARTMENT
OF EDUCATION is a local educational agency ("LEA") as defined in the IDEA, and thus bears
the responsibilities of an LEA under the IDEA and in the New York State Education Law.

31.     Upon information and belief, Defendant DOE is charged with the responsibility of
developing policies with respect to the administration and operation of the public schools in the
City of New York, including programs and services for students with disabilities. N.Y. Educ.
Law § 2590-g.

32.     Upon information and belief, Defendant MELISSA AVILES-RAMOS ("the
Chancellor"), is the Chancellor of the BOE/DOE and, as such, is entrusted with the powers and
duties set forth in N.Y. Educ. Law § 2590-h.

33.     Upon information and belief, Defendants BOE, DOE, and the Chancellor jointly
and/or individually constitute the LEA under the IDEA and state law.

34.     Upon information and belief, the DOE claims to be a municipal agency.

35.     The principal offices of the BOE, DOE, and Chancellor are located at 52
Chambers Street, New York, New York 10004.

36.     The DOE is a creation of the BOE pursuant to the BOE's bylaws.

37.     Defendant CITY OF NEW YORK ("City") is a municipal entity created and
authorized under the laws of the State of New York. Its principal office is located in this judicial
district.

38.     Defendants BOE, DOE, and Chancellor are under the control of Defendant City, which is ultimately responsible for managing those agencies and that individual, funding special education services, and implementing the requested relief pursuant to this action.

39.     All Defendants jointly and/or individually are recipients of federal financial assistance.

40.     When the "DOE" is referenced throughout, the term DOE refers individually to Defendants DOE, as well as collectively to Defendants DOE, BOE, and the Chancellor.

## STATUTORY AND REGULATORY FRAMEWORK

41.     The IDEA guarantees that all eligible children with disabilities, ages three through twenty- one, must be offered a FAPE. 20 U.S.C. § 1412(a)(1).

42.     A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d) (1) (A)-(B).

43.     A FAPE must "include an appropriate . . . secondary school education in the State involved" and be provided in conformity with an IEP. *See* 20 U.S.C. §§ 1401(9), 1414(d)(2)(A); 8 N.Y.C.R.R. § 200.4(e)(1)(ii).

44.     All children who have one or more of thirteen disabling conditions, which includes emotional disabilities, and who, by reason of his/her disability, require "special education" and "related services" are entitled to a FAPE. 34 C.F.R. § 300.8(a)(1). 39. The DOE is responsible for providing a FAPE to all eligible children in New York City and for promulgating policies and procedures in accordance with the IDEA.

45.     Every child with a designated disability classification is entitled to an Individualized Education Program, or "IEP" and the LEA (here, Defendants) must provide an

IEP which must is individually tailored to each student and is meant to serve as a blueprint for each child's special education services. 20 U.S.C. § 1414(d).

46.     By the beginning of each school year, the DOE must have an IEP in place that offers a FAPE to each eligible child. 20 U.S.C. § 1414(d)(2).

47.     Before an IEP can be developed, a child must be evaluated in accordance with detailed procedures outlined in federal and state law.

48.     A child is reevaluated in accordance with the same standards at least once every three years, or more frequently if a parent or school district believes it is necessary.

49.     Among other things, an IEP must be developed by a properly constituted IEP team that includes particular members, including the parent and a district representative who is knowledgeable about the services and able to commit district resources. 20 U.S.C. § 1414(d)(1)(B).

50.     The IEP team must meet at least annually, and more frequently, if necessary, to modify a child's services and/or to address "[a] lack of expected progress toward the annual goals and in the general education curriculum." 20 U.S.C. § 1414(d)(4)(A)(ii)(I).

51.     The IDEA broadly defines the categories of services that must be offered, which include, but are not limited to, special education, related services, supplementary aids and services, transition services, assistive technology ("AT"), and positive behavioral supports and services (collectively "Special Education Services").

52.     The IDEA prescribes, in detail, the process for developing IEPs and their contents. 20 U.S.C. § 1414(d)(1)(A), (d)(2); 34 C.F.R. §§ 300.320(a)(2)-(3); 300.324; N.Y. Educ. Law § 4401, *et seq.;* and 8 N.Y.C.R.R.§ 200.4(d)(2)(iii).

53.     For example, an IEP must contain the results of a child's most recent evaluations, as well as an accurate and consistent description of his/him strengths and present levels of academic achievement and functional performance (called "Present Levels of Performance" or "PLPs"). 20 U.S.C. § 1414(d)(1)(A).

54.     An IEP must contain "a statement of the special education and related services and supplementary aids and services, . . . , to be provided to the child, or on behalf of the child, and a statement of the program modification or supports for school personnel that will be provided for the child." 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

55.     Each IEP must also contain research-based instructional strategies unless they are feasible, including positive behavioral interventions and supports for children whose behavior impedes their learning and/or that of others. 34 C.F.R. §§ 300.320(a)(4), 300.324(a)(2)(i); 8 N.Y.C.R.R. §§ 200.4(d)(2)(v)(b), 200.4(d)(3)(i).

56.     An IEP team must also consider whether a student would benefit from assistive technology ("AT"). 34 C.F.R. §§ 300.5, 300.6, 300.105, 300.324(a)(2)(v).

57.     The DOE is obligated to make decisions about IEPs, services and placements based on student's individual needs, and not policies, procedures, or availability of resources.

58.     The school district, here the BOE and/or DOE, must ensure that "[a]s soon as possible following development of the IEP, special education and related services are made available to the child in accordance with the child's IEP." 34 C.F.R. § 300.323(c)(2). There must be "no delay in implementing" a student's IEP. 34 C.F.R. § 300.103(c).

59.     One of the IDEA's most well-known due process rights is the right to file a due process complaint ("DPC") requesting an impartial hearing "with respect to any matter relating

to the identification, evaluation, or educational placement of [a] child" or the provision of FAPE to a child. 20 U.S.C. § 1415(b)(6)(A).

60.    Under the IDEA, when a parent files a DPC, the student is automatically entitled to continue in his "stay-put" (also called "pendency") educational program throughout the pendency of the proceedings. 20 U.S.C. § 1415(j). The DOE is responsible for implementing a student's pendency program.

61.    The IDEA sets forth detailed requirements for hearing procedures. 20 U.S.C. § 1415(f); 34 C.F.R. §§ 300.511-516.

62.    In New York City, the DOE is responsible for ensuring that impartial hearings comport with the IDEA's requirements and for implementing the orders of the impartial hearing officers. 20 U.S.C. § 1415(f)(1)(A).

63.    A parent that prevails in a due process hearing is entitled to have the school district, here the Defendants, pay their reasonable attorney's fees.

64.    The IDEA and New York education law and regulations ensure that all children with disabilities receive a FAPE in a timely manner that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living, and that the rights of children with disabilities and parents of such children are protected. 20 U.S.C. §§ 1400, et seq; N.Y. Educ. Law §§ 4401, et seq.; 8 N.Y.C.R.R. §§ 200, et seq.

65.    The IDEA's education delivery system begins with the IEP. *Murphy v. Arlington Cent. Sch. Dist. Board of Educ.*, 297 F.3d 195, 197 (2nd Cir. 2002); *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see* 20 U.S.C. § 1414(d).

66.    The IDEA contemplates that an IEP must be implemented as soon as possible stating that: "Each public agency shall ensure that an IEP is implemented *as soon as possible* following the meetings described under §300.343 [i.e., IEP team meetings]." 34 C.F.R. § 300.342(b)(1)(ii) (emphasis added); *see also D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.,* 465 F.3d 503, 508 (2d Cir. 2006).

67.    In New York, the Regulations of the Commissioner of Education enact strict numerical caps for determining how long can be "*as soon as possible*." It is stated at 8 N.Y.C.R.R. § 200.4(e)(1) as follows:

> Within 60 days of the receipt of consent to evaluate for a student not previously identified as having a disability, or within 60 school days of the referral for review of the student with a disability, the board of education shall arrange for appropriate special program and services, ***except that if such recommendation is for placement in an approved in-state or out-of-state private school, the board shall arrange for such programs and services within 30 days of the board's receipt or the recommendation of the committee.*** (emphasis added).

This subsection goes on to prohibit any enlargement of these absolute timelines in cases where the student might be placed in an NPS: "There shall be no delay in implementing a student's IEP, including any case in which the payment source for providing or paying for special education to the student is being determined." 8 N.Y.C.R.R. § 200.4(e)(1)(i).

68.    In other words, once the student's need for residential services has been determined, the provision of these services may not be unreasonably delayed in the process of identifying an ideal residential program for the student. The Commissioner's Regulations repeat the rule that the 60/30 day timelines must be adhered to strictly in the midst of the detailed regulatory schema regarding funding of in-state and out-of-state nonpublic school placements.  It is stated at 8 N.Y.C.R.R. § 200.6(j)(4)(i) & (ii) as follows:

> (i)  It shall be the duty of the local board of education to implement a board-approved committee on special education recommendation for placement in an

approved private school within the time prescribed by section 200.4(e)(1) of this Part.

(ii)  Neither the filing of an application or revised application for reimbursement, nor the filing of a request for review, shall be deemed to relieve the board of education of its responsibility to provide appropriate special programs and services within 30 days of receipt of the recommendation of its committee on special education.(emphasis added). (Note: § 200.6(j) is the successor to 200.6(i), and 200.4(e) is the successor to 200.4(d).)

69.    Under the State law, the Commissioner of Education may approve the provision of "special services or programs" to students with disabilities through a variety of methods, including contracts entered into by boards of education of public schools and "private residential schools . . . which are outside the state" (Educ. Law §§ 4401[2][h], 4402[2][a]; see 8 NYCRR 200.1[d], 200.7).

70.    A parent dissatisfied with a proposed IEP may request an impartial due process hearing, 20 U.S.C. 1415(f)(1)(A), before an impartial hearing officer appointed by the local school board.

71.    An impartial hearing officer's decision may be appealed to the state educational agency 20 U.S.C. 1415(g)(1), after which the aggrieved party can sue in either state or federal court. 20 U.S.C. 1415(i)(2)(A).

72.    The IDEA provides that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child …"  20 U.S.C. 1415(j).

73.    "The term 'educational placement' refers 'only to the general type of educational program in which the child is placed'—*i.e.*, 'the classes, individualized attention and additional services a child will receive.'" *L.G. v. New York City Dep't of Educ.*, No. 23-CV-9268

(JPO), 2023 U.S. Dist. LEXIS 197685, 2023 WL 8044937, at *3-5 (S.D.N.Y. Nov. 3, 2023) *citing Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 525 (2d Cir. 2020); *Concerned Parents v. N.Y. City Bd. of Educ.*, 629 F.2d 751, 753 (2d Cir. 1980); *T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).

74.     An interim placement in an out-of-state non-approved residential NPS can be ordered as an injunctive relief pursuant to 20 U.S.C. §1415(i)(2)(B)(iii). *See L.G.*, 2023 U.S. Dist. LEXIS 197685, 2023 WL 8044937, at *10-11; *A.H. v. New York City Department of Education*, 22-CV-9861 (LGS), (S.D.N.Y. Nov. 23, 2022); *K.S. v. City of New York*, 2023 U.S. Dist. LEXIS 86620, 2023 WL 3510421 at *5-6 (S.D.N.Y. May 17, 2023); *T.C. v. N.Y.C. Dep't. of Educ.*, 23-cv-1887 (ER) (GWG) (S.D.N.Y. April 5, 2023).

75.     Tuition relief is not barred because a private school chosen by a parent does not meet certain state educational standards or is not on a state's specific list of approved private schools. *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, at 14-15 (1993).

## FACTUAL ALLEGATIONS

76.     E.K. has a long history of trauma, parental neglect, and behavioral and emotional problems interfering with her ability to attend and learn in public schools. E.K. biological parents were never married and separated when she was four years old. At the same time, E.K. was removed from her mother's home by the New York City's Administration of Children Services ("ACS") and moved in with Plaintiff M.K. who was granted permanent physical and legal custody on September 12, 2019.

77.     E.K. began to exhibit behavioral issues in kindergarten and was diagnosed with ADHD at 5 years old. She was prescribed medications and received weekly counseling at the Child Center of New York. In March, 2020, E.K. began remote learning as a result of the Covid-

19 Pandemic. She struggled academically and Plaintiff M.K. allowed E.K. to relocate to Aurora, Co,  and then to Geneva, NY, with her father and a stepmother.

78.     E.K.'s relationship with her father and his family was tumultuous. She reportedly suffered physical and emotional abuse while living with them. E.K. began fighting with peers in school, scratching and cutting herself with a razor.

*The 2023-2024 School Year*

79.     In 2022, E.K.'s biological mother died of complications of drug abuse. Her death had a major impact on E.K.'s socio-emotional well-being. After almost failing the 6th grade in the Geneva Middle School, E.K. came back to New York to live with M.K. and started the 7th grade in the Walter Crowley Intermediate School (I.S. 5) for the 2023-2024 school year.

80.     Plaintiff M.K. immediately apprised Defendants' CSE at I.S. 5 of E.K.'s behavioral and social/emotional problems and requested an initial eligibility evaluation for special education support services.

81.     On November 3, 2023, Defendants' CSE convened an initial IEP review meeting. The CSE classified E.K. as having an Other Health Impairment ("OHI") and recommended a placement in a regular education class with the related service of counseling once per week for 30-minutes in a group of five. This program recommendation utterly failed to meet E.K.'s behavioral and social/emotional needs and resulted in significant academic and behavioral regression during the 2023-2024 school year.

82.     In despair, Plaintiff M.K. contemplated sending E.K. to live with his father again. The prospect of returning to live with her father and stepmother caused E.K. an emotional crisis to the point that on April 11, 2024, she ran away from home and threatened to throw herself in

front of a moving car at Queens Boulevard known in the Plaintiffs' community as the "Boulevard of Death."

83.    E.K. was hospitalized at Elmhurst IPP B9 Pediatric Psych Unit from April 11 to April 26, 2024. E.K. was discharged with a diagnosis of Recurrent Major Depressive Disorder unspecified depression episode severity, Post Traumatic Stress Disorder ("PTSD"), and prescribed Latuda and Tramadol. She was assigned six weeks of Home Based Crisis Intervention ("HBCI") through the Child Center of New York ("CCNY"), weekly Trauma Systems Therapy from Forestdale, Inc., and was followed for medication treatment by a Nurse Practitioner at the Institute Center for Counseling. However, the services were terminated early as E.K. was not participating. E.K. had an open ACS case at that time.

*The 2024-2025 School Year*

84.    On June 16, 2024, Defendants' CSE at I.S. 5 reconvened E.K.'s IEP meeting and recommended a twelve-month placement in a day treatment program, 75Q023 at the Queens Children's Center ("QCC"). Plaintiff M.K. informed the CSE that E.K. will not attend QCC and asked for placement in a residential school. Defendants' CSE did not even consider M.K.'s request as they had already decided sending E.K. to QCC before the IEP meeting.

85.    On July 1, 2024, E.K. was evaluated by QCC psychologist, Dr. Robert J. Malsky. The evaluation revealed that E.K. was experiencing a considerable amount of stress/strain, core depression and a disturbing level of internalized anger and dissociative tendencies, as well as abandonment issues and unresolved mourning. She scored in the "significant range" on the Reynolds Adolescent Depression Scale-2. Dr. Malsky noted that E.K.'s emotional pain and conflicts could negatively impact her taxing and judgment controls and might elevate her vulnerability to engage in self-punitive behaviors. During the evaluation E.K.'s affect was

constricted and her mood depressed. She told the evaluator that she felt "mad," and sometimes "feel[s] dead inside." Dr. Malsky recommended that E.K. receive ongoing intense individual psychotherapy and emotional repair work to help her develop the skills necessary to minimize relapse.

86.     On July 8, 2024, E.K. participated in  a QCC psychiatric evaluation by Sobia Rizvi, MD. and Karla Perez, LCSW. At that time E.K. was still attending a "suspension school." The evaluation reiterated E.K.'s detailed history as per the Mental Health Evaluation up to that point in time. E.K. told Dr. Rizvi that "even if she attended" QCC she "would behave however [she] want[ed] to behave." E.K. reported that she takes her Latuda daily but only takes Trazadone as needed.

87.     As of October 30, 2024, the prescription of Tramadol was discontinued and replaced with Prozac to address anxiety and depression and her disruptive mood regulation disorder. The psychiatric evaluation report notes that E.K. is oppositional, defiant and disrespectful towards the grandmother, and that she refused any services in the home.

88.     M.K. was advised to call 911 for psychiatric emergencies, including, but not limited to, E.K. expressing intent to self-injure, suicidal or homicidal ideation, or becoming agitated and aggressive. M.K. was also advised to call 911 when E.K. breaks curfew and does not respond to check-in texts.

89.     As predicted by M.K., E.K.'s attendance at 75Q023 QCC was erratic and the attendance teacher visited her home twice in October 2024, in order to bring E.K. to school. M.K. told the teacher that she was unable to get E.K. to attend school, and that she elopes from home and at times does not return. The teacher spoke to M.K. about involving preventive services and she agreed to mobilize community supports. However, E.K. was not receptive to

receiving any community services. E.K. was also referred for case management but refused to cooperate. M.K. continued to demand that Defendants refer E.K. for a residential placement.

90.    In November 2024, after E.K. stopped attending QCC altogether, Defendants' CSE finally agreed to perform an educational reevaluation for the purpose of considering M.K.'s request to place E.K. in a residential program. However, E.K. had not been attending QCC since November 6, 2024. There were attempts to evaluate E.K. by Defendants' psychologist, Hallie Samuel, on November 26, 27, and then on December 2, 3, and 9, 2024.

91.    On December 10, 2024, E.K. left the house and did not return. M.K. called 911 after she was not able to locate her. E.K. returned home between 2:30 and 3:00 a.m. looking like she was under the influence of drugs. The police called an ambulance to take E.K. to the hospital for an evaluation. After spending a night at the Elmhurst Hospital Emergency Room, E.K. finally agreed to appear for the educational reevaluation at QCC by Defendants' psychologist, Ms. Samuel.

92.    Following the evaluation, Ms. Samuel concluded that E.K. was at risk and required a residential placement due to multiple factors, including a chronic lack of meeting her IEP goals, inability to make meaningful progress, frequent absences, potential substance abuse and lack of success with community resources.

*The December 18, 2024 IEP.*

93.    Defendants' CSE finally agreed with M.K. that E.K. cannot benefit from participation in a special education day program due to her serious behavioral and social/emotional problems, and that she was in immediate need of placement in a therapeutic residential school that provides intensive behavioral management and counseling supports. The

December 18, 2024 IEP changed E.K.'s classification from OHI to ED and deferred E.K. to the CBST for twelve-month placement in a NYSED-approved NPS-Residential.

94.     The CBST is a centralized (i.e., serving the entire school district) department of the DOE that is tasked with applying to appropriate in-state and out-of-state NPS programs for the admission of students that the CSE recommends for placement in an NPS.

95.     The CBST selected ten (10) in-state NPS programs and provided them with E.K.'s records. According to the CBST, most in-state NPS require a student to participate in a screening interview to determine if a school can meet her needs. At least 4 out of 10 selected NPS programs rejected E.K. outright in early January 2025, without asking E.K. to participate in screening interviews. Their reasons for rejecting E.K. included: "cannot meet needs" and "due to a complex combination of presenting factors it appears that [E.K.] requires a higher level of structure and supervision than we are able to provide." At least one in-state NPS rejected E.K. specifically because of "AWOC & Physical Aggression." AWOC stands for Absent Without Consent.

96.     According to the CBST, the other six in-state NPS programs could not accept or reject E.K. because M.K. either refused to bring her for a screening interview or did not return their calls. Plaintiff M.K. denied such accusations and testified that she responded to each and every NPS program that contacted her and explained that E.K. vehemently resisted screening interviews and that she could not force her to come.

97.     At the impartial hearing, Plaintiff M.K. testified under oath that she was ready to place E.K. in any NPS program that would be willing to accept her without a screening interview and/or without her consent for enrollment. Defendants' CBST did not provide any records explaining what exactly Plaintiff M.K. did or did not do to prevent appropriate in-state NPS

programs from accepting E.K. The CBST also did not provide any explanation of how the other 6 in-state NPS programs were any different in terms of its structure or therapeutic support services from the 4 NPS programs that rejected E.K. based on her needs and the fact that she would AWOC even if Plaintiff M.K. could bring her.

98.    On February 27, 2025, the CBST contacted M.K. and advised her that there were two potential NPS programs that were still interested in screening E.K. The CBST did not explain what happened with the remaining four that were interested in interviewing E.K. back in January. Plaintiff M.K. confirmed to the CBST "that [E.K.] is refusing to go on an interview."

99.    Plaintiff M.K. has also been in direct (and by her counsel) communication with Defendants' school psychologist, Hallie Samuel, advising her that E.K. would not agree to participate in screening interviews, M.K. could not bring E.K. to any of the NPS programs on her own, and even if she did, E.K. would not consent to enrollment in any residential NPS, whether in-state or out-of-state.

100.    A week later, Plaintiffs, through their attorney, Anton G. Cohen, Esq., filed a Due Process Complaint ("DPC") seeking funding for placement in the Lake Tahoe Preparatory School ("LTPS"), which had reviewed E.K.'s file and determined that it could address her significant social/emotional and behavioral needs. LTPS later revoked its offer of admission.

*The Impartial Hearing*

101.    On April 4, 2025, Plaintiff M.K., by her counsel, filed an Amended DPC seeking funding for placement at Moonridge. Plaintiff M.K.'s DPC states in relevant part:

> "It is the parents' position that the Moonridge Academy is an appropriate residential placement for the student and is capable of implementing the last-agreed upon IEP dated December 18, 2024. Based on the foregoing, the Moonridge Academy constitutes the student's current educational placement under 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); N.Y. Educ. Law § 4404(4); 8 NYCRR § 200.5(m)."

19

102.    The appointed IHO never addressed Plaintiff M.K.'s request for an interim placement at Moonridge, as it was capable to implement the last agreed upon IEP. Instead, the IHO decided to proceed with the due process hearing ("DPH") on the merits.

103.    The DPH started on May 1, 2025. Defendant presented two witnesses in attempt to demonstrate that E.K.'s IEPs and educational placements at I.S 5 and QCC during the 2023-2024 and 2024-2025 school years were appropriate. Plaintiffs presented two witnesses from Moonridge who testified that Moonridge could implement the program recommended in the December 18, 2024 IEP, and one witness from Right Direction Crisis Intervention who testified about the transportation services and how they could assist with bringing E.K. to Moonridge.[1]

104.    Plaintiff M.K. also testified on May 1, 2025, about her communications with the CSE, CBST, and NPS programs that contacted her to request screening interviews with E.K. As mentioned earlier, Plaintiff consistently testified that she responded to every NPS that contacted her and explained that she was willing to proceed with E.K.'s placement but that she could not bring her for screening interviews.

105.    On the same day, May 1, 2025, Defendants' psychologist, Ms. Samuel, contacted Plaintiff M.K. and scheduled an IEP reconvene review meeting for May 7, 2025; the purpose of the reconvene was to change E.K.'s program recommendation back to a NYC DOE Specialized School in District 75. On that date, Ms. Samuel modified E.K.'s IEP to reflect that change.[2]

---

[1] Defendant DOE's attorney cross-examined Moonridge's Academic Director trying to prove that their classes are smaller in size and therefore cannot implement the 12:1:1 ratio recommended in the December 18, 2024 IEP. However, Defendants' CBST administrator testified via affidavit that NYSED-Approved NPS programs often create their own class ratios that are different from those used in DOE public schools. Accordingly, once a non-public school residential program is recommended, a change in a class ratio does not significantly alter an IEP recommendation. It is common for the class ratio on an IEP with a residential program recommendation to be amended after a state approved non-public school offers placement to a school.

[2] While the change to the IEP was entered at the reconvene on May 7, 2025, the date on the IEP was not modified to reflect the update, and mistakenly remained as December 18, 2024.

106.    Plaintiff M.K. strenuously objected to the proposed action but was told that the residential program recommendation had to be changed back to day program because E.K. was not accepted by any of the in-state NPS programs.

107.    The DPH regarding Plaintiff M.K.'s request for the DOE to pay the cost of E.K.'s placement at Moonridge continued on May 8, 2025. Defendants presented the CBST administrator who accused Plaintiff M.K. of failing to cooperate with CBST placement process. As stated earlier, the CBST administrator could not explain what it was that Plaintiff did, or did not, do that prevented Defendants from placing E.K. in an appropriate residential NPS.

108.    On the same day, Ms. Samuel provided Plaintiff M.K. with a copy of the revised IEP recommending placement in a NYC DOE Specialized School in District 75. The IEP states in relevant part:

> NYSED-Approved Non Public School - Residential - Considered and rejected as previous IEP was sent to CBST. CBST reportedly was unable to secure a Residential school at this time as [E.K.] had not attended any offered screening interviews. 6 residential schools the parent did not agree to or follow up for interview. CBST had requested IEP team explore other options for [E.K.] at this time. Psychologist explained that a residential school was not able to again be recommended at this time since [E.K.'s] evaluations were out the required dates for CBST, and her case was recently unsuccessfully deferred. Psychologist advised Grandmother of her rights to revisit a residential recommendation following the close of this current IEP. Psychologist stated to Grandmother that it is her right to request a re-evaluation at any time, and residential can again be explored. However, at this time it is most important to have [E.K.] attend school, and encouraged Grandmother to explore the current District 75 setting.

109.    On May 28, 2025, IHO Carina Patritti, issued a Findings of Fact and Decision ("FOFD") finding that Defendant denied E.K. a FAPE for the 2023-2024 and 2024-2025 school year. Relying on the recent SRO decision in *Application of a Student with a Disability*, Appeal No. 24-516, IHO Patritti determined that she had no authority to place E.K. in a non-approved NPS absent an unequivocal agreement between the parties that there were no approved schools available. In dicta, IHO Patritti also determined that Plaintiff failed to demonstrate that

Moonridge's program was specifically designed to meet E.K.'s needs and that she also has not shown how the transportation services provided by Right Direction Crisis Intervention were appropriate for E.K. In conclusion, IHO Patritti stated:

> Had I found Chosen Residential School and Transportation to be appropriate, I would find that equities would lean in Grandparent's favor given that DOE has not provided a "brick and mortar" residential school placement and Grandparent tried her hardest to cooperate in that process as much as she could. Though I acknowledge there are concerns about lack of any contract with Chosen Residential School or Transportation Company.

110.    In her Order IHO Patritti directed Plaintiff and the CBST "to reconvene as soon as possible, and no later than 5 business days, to discuss resending referrals to in-state schools, and if needed, or agreed upon, to out-of-state NYSED approved schools." IHO Patritti ordered that "the CBST shall facilitate and discuss with the recommended residential schools, to the extent possible, to have the schools consider waiving [E.K.'s] interview. The CBST and/or CSE shall provide any support needed, including a social worker and/or transportation, to facilitate [E.K.'s] attendance at these interviews."

111.    On June 2, 2025, the CBST administrator contacted Plaintiff M.K. and advised that she will provide a list of all residential NPS programs that are still interested in interviewing E.K.  As of to date, Plaintiff M.K. has not received any documents from CBST.

112.    However, on or about June 3, 2025, representatives of three NYSED-Approved NPS programs contacted Plaintiff and asked if she would be interested in bringing E.K. for screening interviews. Plaintiff M.K. responded that she was always interested and not just in screening interviews but in an actual residential placement for E.K.. She then explained that E.K. was refusing to cooperate and asked if these NPS programs could accept E.K. without a screening interview. The response from all three schools was negative.

113. On June 11, 2025, Defendants' school psychologist, Ms. Samuel, had another IEP review meeting with Plaintiff M.K. The resultant IEP recommended a 12-month residential placement in a NYSED-Approved NPS and sent E.K.'s file back to the CBST to identify an appropriate residential school. Ms. Samuel could not explain why she changed E.K.'s program recommendation to a NYC DOE Specialized School (District 75) on May 7, 2025, and now back to residential placement again.

114. E.K. has suffered and will continue to suffer irreparable harm as a result of Defendant's actions and its failure to act. Every day that passes will result in the continuation of the harm to which E.K. has been subjected to two consecutive school years – the lack of any meaningful educational placement and services, as well as treatment for her serious mental and behavioral difficulties. In short, she has, and continues to be, denied the FAPE guaranteed to her by federal and state law.

115. Unless and until Defendants are ordered to place E.K. at Moonridge and pay the cost of her tuition and transportation services, she will continue to suffer irreparable harm and injury.

## FIRST CLAIM: IDEA's PENDENCY REQUIREMENT

116. The factual allegations set forth in the paragraphs above and below are re- alleged and incorporated herein by reference.

117. E.K. has a qualifying disability under the IDEA.

118. By virtue of E.K.'s disabilities, E.K. requires special education services.

119. Pursuant to 20 U.S. § 1415(j), E.K. is entitled to "stay put" in her "then current placement."

120. E.K.'s last agreed upon program recommendation is a residential NPS.

121.    Upon information and belief, except Moonridge, there is no other in-state or out-of-state residential NPS program available to admit E.K without a voluntary screening interview and her consent.

122.    Defendants have not offered any alternative placement.

123.    Placement at Moonridge is necessary for E.K. to have a temporary placement under §1415(j). Moonridge is capable of providing E.K. with residential services recommended in the December 18, 2024 IEP. Accordingly, Moonridge can implement E.K.'s last agreed upon IEP.

124.    Plaintiff M.K. is not financially able to pay the tuition for Moonridge in advance, and await reimbursement from Defendants' school district.

125.    Plaintiff M.K. cannot afford to pay the cost of transportation expenses to bring E.K. to any residential NPS.

126.    E.K. has no prospect of educational progress without a residential placement.

**SECOND CLAIM: IDEA**

127.    The factual allegations set forth in the paragraphs above and below are re- alleged and incorporated herein by reference.

128.    E.K. is entitled to a free appropriate public education under IDEA.

129.    Defendants have agreed that E.K. requires residential placement to progress but have not provided her with any residential placement.

130.    Although Defendants continue to find E.K. eligible for special education and have provided her with an IEP, Defendants have failed to provide E.K. with a placement that can implement her IEP.

131.    Defendants have denied E.K. a FAPE by failing to provide her with a placement for the 2024-2025 and 2025-2026 school years that can implement her IEP.

132.    This Court has authority to provide injunctive relief "to modify a student's placement pursuant to the equitable authority provided in 20 U.S.C. § 1415(i)(2)(B)(iii)." *See De Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 534, n.65 (2d Cir. 2020); *L.G.*, 2023 U.S. Dist. LEXIS 197685, 2023 WL 8044937, at *10-11; *see also A.H. v. New York City Department of Education*, 22-CV-9861 (LGS), (S.D.N.Y. Nov. 23, 2022); *K.S. v. City of New York*, 2023 U.S. Dist. LEXIS 86620, 2023 WL 3510421 at *5-6 (S.D.N.Y. May 17, 2023); *T.C. v. N.Y.C. Dep't. of Educ.*, 23-cv-1887 (ER) (GWG) (S.D.N.Y. April 5, 2023).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter a temporary restraining order, and a preliminary and permanent injunction granting the following relief:

a.    Issue a temporary restraining order and award preliminary injunctive relief requiring Defendants to immediately and prospectively fund E.K.'s placement at Moonridge on a monthly basis, along with all necessary transportation expenses to transport E.K. to Moonridge, pending the final completion of the administrative review process or E.K.'s placement in an alternative suitable NPS, whichever is earlier.

b.    Award Parent reasonable attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I); and

c.    Grant such other and further relief as the Court deems just and proper.

Dated:  June 12 2025
        New York, New York


/s/Laura Dawn Barbieri_____            /s/ Anton G. Cohen_____
Laura D. Barbieri, Esq., of Counsel              Anton G. Cohen, Esq., of Counsel
The Law Offices of Laura D. Barbieri, PLLC       Law Office of Anton G. Cohen, PC

*Attorneys for Plaintiffs*
115 W 73rd Street, Ste 1B
New York, NY 10023
Tel: (914) 819-3387
Email: LDBarbLaw@gmail.com

*Attorneys for Plaintiffs*
618 Coney Island Avenue
Brooklyn, NY 11218
Tel: (718) 702-5702
Email: anton@aplawny.com